**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JANET G. LYNN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 12-1200 |
| v. | ) | |
| | ) | Judge Nora Barry Fischer |
| CAROLYN W. COLVIN, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

### I.    INTRODUCTION

Janet G. Lynn ("Plaintiff") brings this action pursuant to 42 U.S.C. § 405(g), seeking review of the final determination of the Commissioner of Social Security ("Defendant" or "Commissioner") denying her application for disability insurance benefits ("DIB"), and widow's insurance benefits ("WIB"), under Title II of the Social Security Act, 42 U.S.C. §§ 401 – 433 ("Act").  This matter comes before the court on cross-motions for summary judgment.  (ECF Nos. 15, 17).  The record has been developed at the administrative level.  For the following reasons, Plaintiff's Motion for Summary Judgment will be DENIED, and Defendant's Motion for Summary Judgment will be GRANTED.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on October 6, 2008, claiming a disability onset of January 1, 2008. (R. at 134 – 37, 166).[1] She claimed that her inability to work full-time allegedly stemmed from back problems, a syrinx on her spinal cord, and seizures, resulting in significant pain and difficulty with the use of her arms and legs. (R. at 168). Plaintiff was initially denied benefits on January 6, 2009. (R. at 73 – 77). Following the death of her husband on March 29, 2009, Plaintiff also filed for WIB on July 13, 2009 claiming a disability onset of January 1, 2008. (R. at 78, 158 – 61). Her WIB claim was combined with her previously denied DIB claim, and an administrative hearing was held on March 31, 2010. (R. at 24 – 62). Plaintiff appeared to testify, represented by counsel, and a neutral vocational expert also testified. (R. at 24 – 62). In a decision dated June 14, 2010, the ALJ denied Plaintiff the benefits sought. (R. at 9 – 23). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, but this request was denied on July 6, 2012, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 1 – 6).

Plaintiff filed her Complaint in this Court on August 22, 2012. (ECF No. 3). An Amended Complaint (ECF No. 9) was filed on December 14, 2012, and Defendant filed an Answer (ECF No. 12) on February 20, 2013. Cross motions for summary judgment followed. (ECF Nos. 15, 17). The matter has been fully briefed, and is ripe for disposition.

## III. STATEMENT OF FACTS

The facts relevant to the present case are limited to those records that were available to the ALJ when rendering his decision. All other records newly submitted[2] to the Appeals Council or this court will not be considered, here, and will not inform the decision of this court. *See*

---

[1] Citations to ECF Nos. 13 – 13-12, the Record, *hereinafter*, "R. at __."
[2] ECF No. 15-1 – 15-5, Exhibits 1 – 5.

*Matthews v. Apfel*, 239 F. 3d 589, 592, 594 – 95 (3d Cir. 2001).[3]

A.  <u>General Background</u>

Plaintiff was born on May 11, 1951, was fifty seven years of age at the time of her application for DIB, and was approaching fifty nine years of age at the time of her administrative hearing.  (R. at 28, 164).  She graduated from high school, and attended beauty school – where she was trained in cosmetology.  (R. at 29).  Plaintiff previously worked as a hairstylist, her last day of work being in June 2005.  (R. at 168 – 69).  She had additional part-time work experience as a substitute in a high school cafeteria and as a deli counter attendant at a Shop and Save.  (R. at 30).  At the time of her application for benefits, Plaintiff allegedly chose to stop working as a hairstylist because she had to care for her mother-in-law.  (R. at 168).  During the ALJ hearing, however, she stated that she stopped working because her husband was ill.  (R. at 43).

When Plaintiff applied for DIB, she was able to engage in light household duties, meal preparation, grocery shopping, laundry, and pet care.  (R. at 183 – 84).  She was able to provide for her own personal care; however, bending over to put on her shoes and using her arms to blow-dry her hair were painful.  (*Id.*).  Plaintiff was able to walk without an assistive device.  (R. at 189).  Plaintiff enjoyed easy crossword puzzles, knitting, sewing, and crafts.  (R. at 187).  Plaintiff participated in these activities a few days per week, for an hour or less, because her hands or arms became painful.  (*Id.*).  She visited her mother twice a week, and went to church

---

[3]     The Appeals Council may decline review of a claimant's case when the ALJ's decision is not at odds with the weight of the evidence on record.  *Matthews*, 239 F. 3d at 592.  In such a case, a district court can only review that evidence upon which the ALJ based his or her decision.  *Id.* at 594 – 95.  As a result, new evidence presented by a claimant to the Appeals Council, but not reviewed, is not within the purview of a district court when judging whether substantial evidence supported an ALJ's determination.  *Id*.  Furthermore, a district court lacks the authority to review the Appeals Council's decision to deny review of the ALJ's decision.  *Id.* at 594.  Such is the case at present.  Additionally, Plaintiff failed to make the required showing under *Szubak v. Sec'y of Health and Human Serv.*, 745 F. 2d 831 (3d Cir. 1984), for remand to reconsider the case in light of newly submitted evidence not considered by the ALJ when making his decision.  Therefore, the case will not be remanded for this purpose, and Exhibits 1 – 5 contained within Plaintiff's Motion for Summary Judgment (ECF No. 15, 15-1 – 15-5) will not be discussed.

on Sundays. (*Id.*). Plaintiff was able to handle her finances. (R. at 186). Plaintiff was living with her husband when she filed for DIB. (D. at 134). Her husband subsequently passed away on March 29, 2009. (R. at 29). At the time of the administrative hearing, the Plaintiff was living with a friend, and had one adult child. (R. at 29, 39, 259).

B. Treatment History

1. *Right Knee Injury*

Plaintiff sustained a tear to the medial meniscus and anterior cruciate ligament of her right knee.[4] (R. at 256). She was also diagnosed with chondromalacia,[5] osteoarthritis, and a tibial tubercle[6] of the right knee. (*Id.*). Plaintiff underwent arthroscopic surgery performed by Dr. John P. Scullin at UPMC Horizon, on October 9, 2001. Upon completion of the procedure, Plaintiff was reported to be in satisfactory condition. (*Id.*). At a subsequent doctor's appointment with Dr. Kary J. Schroyer at New Wilmington Family Medicine Associates ("New Wilmington") on January 6, 2010, Plaintiff complained of right knee pain. (R. at 514). However, Dr. Schroyer observed that Plaintiff walked with a normal gait. (R. at 515).

2. *Left Foot Pain*

On October 5, 2007, Plaintiff presented with pain, swelling, and bruising to her left foot, after having dropped something on it.[7] (R. at 239). Dr. Mohamad Abul-Ela ordered an x-ray at Jameson Hospital in New Castle, Pennsylvania. (*Id.*). The x-ray revealed no fractures or

---

[4]    The date of injury is not contained within the record.
[5]    Chondromalacia is a softening of the cartilage. STEDMAN'S MEDICAL DICTIONARY 369 (28th ed. 2006).
[6]    A tibial tubercle is a rounded, solid elevation of the surface of the tibia bone, which becomes attached to a muscle or ligament. STEDMAN'S MEDICAL DICTIONARY 2043 (28th ed. 2006).
[7]    The date of injury is not contained within the record.

dislocations, but did show degenerative changes, exostosis[8] of the big toe, an inferior calcaneal spur,[9] and calcaneal enthesopathy.[10]  (*Id.*).

### 3.  *Right Elbow Pain*

On January 26, 2007, Plaintiff was examined by Dr. Scullin for right elbow pain.  (R. at 271-72).  Plaintiff stated that she had soreness, weakness, and occasional pain and numbness in the right elbow and hand.  (R. at 271).  She stated that the pain began after undergoing a blood test, where the tourniquet was tied too tightly.  (*Id.*).  Plaintiff rated the pain as mild to moderate. (*Id.*).  Dr. Scullin recommended an MRI of the elbow, which plaintiff underwent the next day, January 27, 2007.  (R. at 272, 237).  The imaging revealed a very small joint effusion[11] of unknown etiology, and was otherwise unremarkable.  (*Id.*).

### 4.  *Back disorders*

On January 13, 2008, Plaintiff was admitted to Jameson Health System Emergency Department after falling down several steps while at home.  (R. at 325-328).  Plaintiff complained of pain extending from her lower back into the neck and shoulder area.  (R. at 335). The following day, an x-ray was taken and analyzed by Dr. Albert J. Cook II.  (*Id.*).  Images were taken of the cervical, thoracic, and lumbar spine.  (R. at 335-36).  The x-rays showed that the bones were in anatomic alignment, and no fractures or foreign bodies were identified.  (*Id.*). Dr. Cook found that the x-ray images were consistent with degenerative disc disease, degenerative facets disease, and loss of disc space.   (*Id.*).

---

[8]	Exostosis is a cartilage-capped bony growth.  STEDMAN'S MEDICAL DICTIONARY 683 – 84 (28th ed. 2006).

[9]	A calcaneal spur is a small projection on the heel bone.  STEDMAN'S MEDICAL DICTIONARY 286 – 87, 1816 (28th ed. 2006).  Plaintiff's medical record notes this condition can be consistent with chronic pain.  (R. at 239).

[10]	Calcaneal enthesopathy is a disease process occurring at the insertion of muscle tendons and ligaments into the heel bone.  STEDMAN'S MEDICAL DICTIONARY 286, 649 (28th ed. 2006).

[11]	A collection of fluid around a joint. STEDMAN'S MEDICAL DICTIONARY 616 (28th ed. 2006).

On May 20, 2008, Plaintiff went to Dr. Scullin complaining of sharp, throbbing, aching, and burning, intermittent back pain. (R. at 274). Plaintiff rated the persistent discomfort as a two out of ten in severity, aggravated by walking, lying, sitting, and sneezing. (*Id.*). Plaintiff's discomfort was primarily located in the mid and lower back area. (*Id.*). Plaintiff reported that chiropractic treatments helped relieve the discomfort. (*Id.*). Dr. Scullin examined the x-rays taken by Dr. Cook at Jameson Hospital on January 14, 2008, and found they were consistent with degenerative disc disease, and spondylosis. (*Id.*). His impression was that Plaintiff suffered from dorsal and lumbar pain with spondylosis, and degenerative disc disease, with possible disc pathology or nerve irritation. (R. at 275). He recommended an MRI be performed. (*Id.*). Dr. Scullin further recommended that Plaintiff seek physical therapy; however, she declined. (*Id.*).

The recommended MRI was performed on May 23, 2008 at Jameson Hospital by Dr. Schroyer. (R. at 269). The MRI showed disc degeneration at multiple levels, and mid disc bulges at all lumbar levels. (*Id.*). No stenosis[12] or foraminal narrowing[13] was identified in the lumbar spine. (*Id.*). Mild degenerative changes with disc bluges, without stenosis, of the thoracic spine was also present. (R. at 270). A syrinx[14] was found, involving the thoracic cord without cord enhancement. (*Id.*). Dr. Scullin analyzed the MRI images at a subsequent appointment on May 29, 2008. (R. at 276). He diagnosed Plaintiff with thoracic and lumbar

---

[12]    Stenosis describes a narrowing of any canal or orifice, here, the spinal cord. STEDMAN'S MEDICAL DICTIONARY 1832 (28th ed. 2006).

[13]    Foraminal narrowing is another term for spinal stenosis, or a narrowing of the openings where spinal nerves leave the spinal columns. Spinal Stenosis, UPMC, *available at* http://www.upmc.com/health-library/Pages/ADAM.aspx?GenContentId=000441&ProductId=115&ProjectId=1 (last visited June 17, 2013).

[14]    Syringomyelia is a disorder in which a cyst forms within the spinal cord. The cyst, called a syrinx, expands and elongates over time, destroying a portion of the spinal cord from its center and expanding outward. As a syrinx widens it compresses and injures nerve fibers that carry information from the brain to the extremities. Damage to the spinal cord often leads to progressive weakness in the arms and legs, stiffness in the back, shoulders, arms, or legs, and chronic, severe pain. Other symptoms may include headaches, a loss of the ability to feel extremes of hot or cold (especially in the hands), and loss of bladder or other functions. Each individual experiences a different combination of symptoms depending on where in the spinal cord the syrinx forms and how far it extends. National Institute of Neurological Disorders and Stroke, http://www.ninds.nih.gov/disorders/syringomyelia/detail_syringomyelia.htm (last visited July 19, 2013).

pain with a hemangioma-like[15] lesion of the right pedicle of D7[16] and mild degenerative changes with disc bulges. (*Id.*). He recommended a neurosurgical evaluation, and prescribed Ibuprofen for pain. (*Id.*).

On June 5, 2008, Plaintiff had an appointment with Dr. Matt El-Kadi at the UPMC neurosurgical clinic. (R. at 259 – 60). Plaintiff complained of lower back stiffness with radiation to the left hip, bilateral lower extremity pain with numbness in the right lower extremity, intermittent tingling and weakness in the left lower extremity, thoracic spine pain, and headaches with cervical spine pain and intermittent bilateral upper extremity pain. (R. at 259). She reported an episode in April of having severe nerve pain across her thoracic spine, underneath her armpit, into the right breast and chest with numbness and sensitivity to touch. (*Id.*). Plaintiff stated she was using Motrin to alleviate the pain. (*Id.*). Dr. El-Kadi reviewed the MRI from May 23, and found that it was indicative of syrinx in the thoracic spine, but no spinal or foraminal stenosis. (R. at 260). The lumbar spine also revealed no spinal or foraminal stenosis. (*Id.*). Dr. El-Kadi did not recommend surgery, and advised Plaintiff to continue receiving chiropractic care, and prescribed Percocet – which provided relief. (*Id.*).

Plaintiff was examined twice by Dr. Scullin in May 2008 for complaints of back pain. (R. at 274 – 76). Plaintiff exhibited a normal mood and affect. (R. at 274 – 76). She walked without a limp, she had slight discomfort in her neck and spine with extreme motion, no strength deficits, no instability, full range of motion, normal reflexes, negative straight leg raising, and normal coordination, and her light touch sensation in the hands was intact. (*Id.*). The findings

---

[15]     A hemangioma is a vascular tumor, which may be present at birth or develop during life, and can occur anywhere in the body. STEDMAN'S MEDICAL DICTIONARY 861 (28th ed. 2006). When occurring on the bones of the spine, hemangiomas are often found in the back above and just below the waist. They are benign, and usually involve only one vertebra. The most common symptom is pain, but not all hemangiomas produce symptoms. Health Conditions: Hemangioma, Cedars-Sinai, http://www.cedars-sinai.edu/ Patients/Health-Conditions/ Hemangioma.aspx (last visited July 19, 2013).
[16]     The right section of vertebrae D7. STEDMAN'S MEDICAL DICTIONARY 1446 (28th ed. 2006).

were considered to be consistent with degenerative disc disease and spondylosis. (*Id.*). A syrinx in the thoracic spine and hemangioma-like lesion were also noted. (*Id.*). Plaintiff was advised to engage in chiropractic treatment and physical therapy, but declined physical therapy. (*Id.*). Ibuprofen was suggested for her pain. (*Id.*).

On June 19, 2008, Plaintiff met with Dr. Scullin, where she expressed dissatisfaction regarding her interaction with Dr. El-Kadi. (R. at 277). She stated that she was seen by a Dr. Matthews[17] in the interim, who felt the abnormality on the MRI from May 23 was a hydromyelia[18] and not a syrinx. (*Id.*). Dr. Scullin observed that Plaintiff's mood and affect were normal. (*Id.*). Plaintiff walked without a limp and had no gross instability or strength defects, but Plaintiff indicated tenderness to touch on her back, and discomfort at the extremes of neck motion. (*Id.*). Dr. Scullin diagnosed Plaintiff with mid and low back discomfort with spondylosis, degenerative disc disease, and a syrinx of the thoracic spine. (*Id.*). He encouraged Plaintiff to follow up with Dr. Matthews, or her family physician, with reevaluation as needed. (*Id.*). Dr. Scullin advised that epidural injections could be considered if the symptoms persisted, and Dr. Matthews felt they would be beneficial. (*Id.*). Plaintiff did attempt to engage in physical therapy in August 2008. (R. at 365 – 71).

On September 24, 2008, Plaintiff was examined by Dr. Ernest Braxton for a neurosurgical evaluation. (R. at 421 – 22). He noted that Plaintiff complained of midthoracic and paraspinal pain. (R. at 421). Past MRI's had revealed the presence of a syrinx in the thoracic spine. (R. at 421). Dr. Braxton observed that Plaintiff had full strength in her upper and lower extremities. (R. at 422). Her sensation was intact. (R. at 422). Dr. Braxton opined that

---

[17]    This is likely Dr. Michael K. Matthews, Jr., M.D., Ph.D., a UPMC doctor who is referenced elsewhere in the record.
[18]    Hydromyelia is an increase of fluid in the spinal cord. STEDMAN'S MEDICAL DICTIONARY 912 (28th ed. 2006).

Plaintiff's pain was likely unrelated to the syrinx. (R. at 422). He recommended only conservative treatment in the form of physical therapy and anti-inflammatory medication. (R. at 422).

On November 2, 2008, Plaintiff returned for a follow-up examination with Dr. Braxton. (R. at 418). Dr. Braxton noted complaints of back pain, bilateral arm numbness, and right thigh pain. (R. at 418). Plaintiff's thoracic syrinx was also acknowledged. (R. at 418). Upon examination, Dr. Braxton observed Plaintiff to be alert and oriented with appropriate speech and attention. (R. at 418). Plaintiff had full strength in her upper and lower extremities. (R. at 418). She exhibited decreased sensation to light touch in the palms of both hands, however. (R. at 418). Dr. Braxton reviewed MRI's of Plaintiff's spine and noted the existence of mild spondylosis of the cervical spine, a stable syrinx and spondylosis in the thoracic spine, and mild spinal degenerative disease. (R. at 418). Dr. Braxton opined that the best course of treatment would be continuation of conservative measures including use of anti-inflammatory medication. (R. at 418).

Plaintiff underwent another MRI on November 11, 2008 at Jameson Hospital, ordered by Dr. Jack E. Wilberger. (R. at 412). The MRI revealed stable appearance of the syrinx compared to the exam conducted on May 23, with multilevel degenerative changes again seen. (*Id.*). A small right paracentral disc protrusion was also revealed in the cervical spine. (R. at 413). Dr. Braxton reviewed the MRI findings on November 21, 2008, and concluded that Plaintiff had cervical spondylosis and mild degenerative changes, as well as a stable syrinx in the thoracic spine without enhancement of the spinal cord. (R. at 420). Plaintiff was advised to engage in physical therapy and to continue use of anti-inflammatory medications. (R. at 420).

On September 3, 2009, Plaintiff went to New Wilmington for an examination with Dr. Schroyer, complaining of moderate back pain and severe neck pain. (R. at 505). She claimed the symptoms began around August 4, 2009, and stated the back pain was aggravated by sitting and standing. (*Id.*). The doctor found the neck was normal upon inspection, and Plaintiff walked with a normal gait. (*Id.*). No issues with spinal alignment were found. (R. at 506). Dr. Schroyer stated that Plaintiff suffered from sprains and strains of the lumbar spine and an unspecified spinal cord disease. (*Id.*). Dr. Schroyer recommended following up with an MRI in one to two months. (*Id.*).

5. *Extremity Pain and Numbness*

On February 1, 2007, Plaintiff underwent a cervical radiculopathy examination to evaluate numbness and tingling in her right arm. (R. at 263). The procedure was supervised by Dr. Ram Tata, M.D., at Jameson Hospital, and revealed results within the normal limits. (R. at 264). Over a year later, at the June 5, 2008 appointment with Dr. El-Kadi, Plaintiff presented with lower extremity pain and numbness in the right leg. (R. at 259 – 60). She also complained of intermittent tingling and weakness in her left leg. (*Id.*). Dr. El-Kadi stated that there is no indication for surgery at this time, and that Plaintiff should continue with chiropractic care. (R. at 260).

On August 11, 2008, Plaintiff underwent an EMG at UPMC. (R. at 293). Plaintiff complained of numbness and tingling in her hands and feet. (*Id.*). Dr. Robert Brown completed a report which revealed normal EMG nerve conduction with no evidence of radiculopathy, plexopathy,[19] entrapment neuropathy,[20] or peripheral neuropathy.[21] (R. at 294).

---

[19]     Disorder involving one of the major peripheral neural plexuses (nerve networks): cervical, brachial, or lumbosacral. STEDMAN'S MEDICAL DICTIONARY 1513 – 15 (28th ed. 2006).
[20]     Repetitive stress frequently leads to entrapment neuropathies, a special category of compression injury. Cumulative damage can result from repetitive, forceful, awkward activities that require flexing any group of joints

At an appointment with Dr. Matthews on July 29, 2008, Plaintiff complained about numbness and burning on the soles of her feet when walking. (R. at 283). She further described feeling occasional tingling in the tips of her fingers. (*Id.*). Dr. Matthews recommended a podiatric consultation. (R. at 284).

6. *Seizures*

On June 11, 2008, Plaintiff had an appointment with Dr. Matthews at UPMC neurology regarding her seizure condition. (R. at 287 – 89). Dr. Matthews provided an overview of the patient's history of seizures. (R. at 287). Plaintiff stated that she experienced seizures all of her life, and was first diagnosed in 1991 when she suffered what was probably a petit mal seizure.[22] (*Id.*). In 1981, she was taken to the hospital where she had a Jacksonian seizure.[23] (*Id.*). She began to take Dilantin[24] after the 1981 seizure, which eliminated all spells.[25] (*Id.*). She continued with Dilantin for five or six years, during which time she had no spells. (*Id.*). After this period of time, she became symptomatic again, described as inner quivering, and shivering. (*Id.*). Plaintiff told Dr. Matthews that she began taking Dilantin again in 2007, but it was necessary to increase her dosage in order to control the symptoms. (*Id.*). At the time of the appointment, she was no longer having spells. (*Id.*). Dr. Matthews advised that Plaintiff

---

for prolonged periods. The resulting irritation may cause ligaments, tendons, and muscles to become inflamed and swollen, constricting the narrow passageways through which some nerves pass. National Institute of Neurological Disorders and Stroke, http://www.ninds.nih.gov/disorders/peripheralneuropathy/detail_peripheralneuropathy.htm#183593208 (last visited July 19, 2013).

[21]     Peripheral neuropathy describes damage to the peripheral nervous system, the vast communications network that transmits information from the brain and spinal cord (the central nervous system) to every other part of the body. National Institute of Neurological Disorders and Stroke, http://www.ninds.nih.gov/disorders/peripheral neuropathy /detail_peripheralneuropathy.htm#183593208 (last visited July 19, 2013).

[22]     A petit mal seizure does not involve whole body movements like a grand mal seizure, and can be associated with several different EEG patterns. STEDMAN'S MEDICAL DICTIONARY 1744 (28th ed. 2006).

[23]     Jacksonian seizures initially involve one part of the body, and then progressively spread to other parts of the body on the same side. STEDMAN'S MEDICAL DICTIONARY 1744 (28th ed. 2006).

[24]     Dilantin is used to treat seizures. PubMed Health, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0001418/ (last visited June 17, 2013).

[25]     Several of the reports within Plaintiff's medical records describe her seizures or seizure-like episodes as "spells."

continue on Dilantin, as it was adequately controlling her condition. (*Id.*). At a follow-up appointment with Dr. Matthews on June 19, 2008, Plaintiff reported no seizures. (R. at 285). On July 29, 2008, Plaintiff had another follow-up with Dr. Matthews and again reported being seizure-free. (R. at 283).

On August 31, 2009, Plaintiff went to New Wilmington and stated that she had experienced a seizure the previous night, and another the morning before the appointment. (R. at 503). Dr. Schroyer examined her, advised her that she not drive that day, and referred her back to Dr. Matthews. (R. at 504). There is no record of a follow-up with Dr. Matthews; however, on October 5, 2009, Plaintiff returned to New Wilmington for a follow-up with Dr. Schroyer. (R. at 507). At that appointment, Plaintiff stated that she did not think she had suffered a seizure since the last visit. (*Id.*). Plaintiff was still taking Dilantin at this time. (R. at 508).

7. *Headaches*

During the June 11, 2008 UPMC Neurology appointment with Dr. Matthews, in his review of Plaintiff's symptoms, the doctor stated that she had suffered a chronic daily headache for many years. (R. at 287 – 89). Plaintiff reported that the headache tended to be holocranial,[26] but in 2007 began to focus on the left side. (*Id.*). Plaintiff stated she was not always awakened from sleep by the headache, but it was always present. (*Id.*). Plaintiff reported taking Tylenol five times per day for well over a year. (*Id.*). Dr. Matthews diagnosed her with medication overuse headache syndrome, and rebound headache. (*Id.*). The doctor surmised that the headaches may have been due to withdrawal from Tylenol, or possibly poor sleep. (*Id.*). He stated that the left-sided headaches raised the possibility of a meningioma.[27] (*Id.*). Following a motor examination, Plaintiff's gait and balance were noted to be normal, cervical range of

---

[26]     Involving the entire head. STEDMAN'S MEDICAL DICTIONARY 896 (28th ed. 2006).
[27]     A meningioma is a benign brain tumor. STEDMAN'S MEDICAL DICTIONARY 1182 (28th ed. 2006).

motion was somewhat limited by discomfort, but otherwise normal, sensation was normal, and coordination was normal. (*Id.*). On Dr. Matthews' recommendation, a brain MRI was performed at Jameson Hospital on June 17, 2008. (R. at 290). The results were normal. (*Id.*).

On July 29, 2008, Plaintiff returned to Dr. Matthews for complaints of headache pain. (R. at 283 – 84). The headache was constant, and predominantly left-sided. (*Id.*). It was accompanied by light sensitivity and irritability. (*Id.*). Upon examination, Plaintiff's gait was normal, she exhibited no pain behaviors, limb recruitments were normal, she had normal sensation in the upper extremities, and she had some right hemifacial spasm. (*Id.*). Overuse of Tylenol was a primary cause of Plaintiff's pain.[28] (*Id.*).

While at an examination at New Wilmington in September 2009, Plaintiff denied experiencing dizziness, headaches, lightheadedness, loss of consciousness, numbness, seizures, and weakness. (R. at 505). No acute distress was observed. (R. at 505). Plaintiff was cooperative and her behavior was appropriate. (R. at 505). She denied these same symptoms again on October 5, 2009, and on January 6, 2010. (R. at 507, 514).

Dr. Matthews reviewed the results of another MRI and examined Plaintiff on February 10, 2010. (R. at 499 – 500). Plaintiff complained of worsening headaches and "spells" following a change of migraine headache medication. (R. at 499 – 500). Dr. Matthews observed Plaintiff to be depressed. (R. at 500). He believed that her "spells" could be seizures, but were of unknown cause. (R. at 500). Plaintiff's seizures were noted to be under good control. (R. at 500). Dr. Matthews suggested a change in medication, and additional MRI and EMG testing. (R. at 500).

---

[28]     Plaintiff did not have sufficient insurance coverage to receive certain prescribed migraine headache medications. (R. at 283 – 84).

8. *Sleep apnea*

During a June 11, 2008 appointment, Dr. Matthews noted Plaintiff's obstructive sleep apnea.  (R. at 287).  He further observed that she had a continuous positive airway pressure machine ("CPAP machine"),[29] but was not using it because it allegedly inhibited her ability to care for her husband.  (*Id.*).  A similar report was made by Dr. Schroyer on August 11, 2009, wherein Plaintiff stated she was not using her CPAP machine.  (R. at 501).  She explained that she did not use it because of morning sinus pain and sinusitis.  (*Id.*).  At a subsequent appointment with Dr. Schroyer on January 1, 2010, Plaintiff again claimed she was having problems with her CPAP and that it did not alleviate her snoring.  (R. at 514).

9. *Hypertension*

During the June 5, 2008 appointment at UPMC with Dr. El-Kadi, Plaintiff was negative for hypertension.  (R. at 259).  However, Plaintiff tested positive for hypertension at several other points throughout her medical records.  (See, R. at 259, 295, 298, 309, 385, 408, 500).  She has also been prescribed medication for hypertension.  (R. at 47).

10. *Depression*

At an appointment with Dr. El-Kadi at UPMC on June 5, 2008, Plaintiff reported suffering from claustrophobia.  (R. at 259).  Plaintiff told Dr. Matthews that she was subject to depression during a June 11, 2008, appointment.  (R. at 287).  Dr. Matthews did not recommend psychiatric care or medication at that time, but at a subsequent appointment on February 10, 2010, he reported that the patient was "angry and anxious".  (R. at 289, 499).  However, at an appointment at New Wilmington on August 11, 2009, Plaintiff denied anxiety, difficulty

---

[29]     Continuous positive airway pressure machine, uses mild air pressure to keep airways open, can be used to aid sleep apnea.  STEDMAN'S MEDICAL DICTIONARY 454 (28th ed. 2006); What is CPAP?, National Heart, Lunch, and Blood Institute, *available at*  http://www.nhlbi.nih.gov/health/health-topics/topics/cpap/  (last visited June 17, 2013).

concentrating, depression, memory loss, mood changes, sleep pattern disturbance, and suicidal thoughts.  (R. at 501).  There were no signs of acute distress.  (*Id.*).  Plaintiff exhibited normal mood and affect.  (R. at 502).  She had full strength and a normal gait.  (R. at 502).  She stated that her stress and depression had improved since her son moved out.  (R. at 501).  Plaintiff denied depression at New Wilmington appointments on August 31, 2009 and January 6, 2010, and Plaintiff's disposition was recorded as normal.  (R. at 503, 514).

    C.  Functional Capacity Assessments

On January 1, 2009, state agency evaluator Dilip S. Kar, M.D. completed a Physical Residual Functional Capacity Assessment ("RFC") of Plaintiff.  (R. at 441 – 48).  Based upon his review of the medical record, Dr. Kar concluded that the evidence supported finding impairment in the way of degenerative disc disease, syrinx, and seizure.  (R. at 441).  As a result, he determined that Plaintiff would be limited to occasionally lifting and carrying twenty pounds, frequently lifting and carrying ten pounds, standing and walking about six hours of an eight hour work day, and sitting about six hours.  (R. at 442).  Plaintiff could only occasionally climb.  (R. at 443).  She would need to avoid all exposure to workplace hazards such as machinery and heights.  (R. at 444).  She was not otherwise limited.  Dr. Kar based his findings upon the treatment notes of Drs. El-Kadi, Braxton, and Matthews.  (R. at 446 – 47).  Plaintiff's subjective claims were not considered to be consistent with her treatment history.  (R. at 447 – 48).

On or about May 6, 2009, New Wilmington Family Medicine Associates completed a Pennsylvania Department of Public Welfare Employability Assessment form.   (213 – 14).  Plaintiff was indicated therein to be permanently disabled.  (R. at 214).  The reasons cited for Plaintiff's disability were her diagnoses of syringomyelia, degenerative joint disease, obstructive sleep apnea, and hypertension.  (R. at 214).  No further explanation was provided.

D. <u>Administrative Hearing</u>

Plaintiff testified that she received a high school education and also graduated beauty school after being trained in cosmetology. (R. at 29). She was widowed on March 29, 2009 and had no children who were still minors at that time. (*Id.*). Plaintiff had not worked since January 1, 2008, and had received welfare benefits at some point after that time. (*Id.*). She previously worked as a hairstylist, as a substitute in a high school cafeteria, and at a Shop and Save deli. (R. at 29 – 30). She only worked at the cafeteria approximately three times a year, over a period of "a few years." (R. at 30). Her work at the Shop and Save was part-time, lasting a year and a half. (*Id.*). At the time of the hearing, Plaintiff claimed to be five feet, four inches tall, weighing 200 pounds. (R. at 38). Plaintiff testified she was able to provide for her own personal care. (R. at 39). While she could complete chores on her own, Plaintiff stated she required assistance from a live-in friend to complete routine household chores. (R. at 39 – 40). She told the ALJ that she did her own grocery shopping and went to restaurants on Sundays with her family. (R. at 40 – 41).

Plaintiff stated that she suffered from a seizure disorder and headaches. (R. at 31). However, Plaintiff had a valid driver's license and relayed that she drove without impediment.[30] (R. at 31 – 33). She agreed that her seizures were controlled by medication. (R. at 32 – 33). However, she later testified that she had suffered a seizure one month before the hearing. (R. at 46). Plaintiff recounted suffering from almost daily headaches, which were made "much better" by increasing her medication. (R. at 34). When these headaches occurred, Plaintiff explained that they were not totally debilitating, and she was able to complete tasks, if they were "urgent."

---

[30]     The ALJ was concerned that Plaintiff continued to drive while diagnosed with seizures, and inquired as to why Plaintiff's physician had not revoked Plaintiff's driver's license in accordance with Pennsylvania law. (R. at 31 – 32). *See* 75 PA. CONS. STAT. §1518 (Reports on mental or physical disabilities or disorders); 67 PA. CODE §83.4 (Seizure disorder). Plaintiff responded that her doctor had mentioned the need for Plaintiff to surrender her license, but that "he changed his mind," because her seizures were controlled with medication. (R. at 32).

(R. at 35). When the headache was "bad," Plaintiff would lie down in a quiet and dark place. (R. at 45).

Plaintiff testified regarding her back and knee pain. She explained that she could walk approximately thirty feet before experiencing pain, and fifty feet before having to stop. (R. at 36). After walking fifty feet, Plaintiff stated she would feel "really weak" and would have pain in her back and legs. (*Id.*). To relieve her symptoms, Plaintiff would either sit or lean against something. (*Id.*). Plaintiff stated she could stand for ten to fifteen minutes, so long as she had something to lean on. (*Id.*). Plaintiff testified that she did not have trouble sitting, if able to shift positions in her chair, and could bend over, but with difficulty. (*Id.*). She stated that she could lift two to three pounds, and five pounds with difficulty. (*Id.*). Plaintiff was also taking Flexeril[31] and Meloxicam.[32] (R. at 38). Plaintiff indicated that her knees hurt "very often," however, her right knee was more bothersome. (R. at 39). Although her doctor suggested that she walk with a cane, Plaintiff did not use any assistive devices to walk because it hurt her back. (R. at 33). Plaintiff complained that she was suffering from increasing stiffness, "a lot more" pain in her legs, and "a lot more" numbness and tingling in her hands and feet. (R. at 40).

Plaintiff briefly addressed her mental condition, as well. In response to a question posed by the ALJ regarding whether she had sought treatment from a mental health professional, psychiatrist, psychologist, or mental health therapist, in the past two years, Plaintiff replied in the negative.[33] (R. at 33 – 34).

---

[31]    Flexeril, also called cyclobenzaprine, treats pain and stiffness caused by muscle spasms. Cyclobenzaprine, PubMedHealth, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0009767/ (last visited June 17, 2013). It is a muscle relaxant. *Id.*

[32]    Meloxicam is an NSAID pain reliever that treats the symptoms of osteoarthritis and rheumatoid arthritis. Meloxicam, PubMed Health, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0011069/ (last visited June 17, 2013).

[33]    However, when asked by her own attorney about other medications she was taking, Plaintiff testified she was taking Prozac. (R. at 46). Prozac is an antidepressant. Fluoxetine, PubMed Health, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010346/ (last visited June 71, 2013).

Plaintiff testified that she was no longer able to work as a hairstylist. (R. at 42). Such work would require the use of her hands for the manipulation of small objects like scissors and brushes, which she found difficult. (R. at 42 – 43). Tingling and numbness in her hands and arms would cause her to drop things, and make it difficult to pick things up. (R. at 44). She also stated that she was often drowsy and had to take approximately two naps a day.[34] When her headaches were especially bad, she said she would need to lay down. (R. at 45).

At the conclusion of Plaintiff's testimony, the ALJ examined the vocational expert, Dr. Monaco[35], by posing hypothetical questions. (R. at 50 – 62). To begin, the ALJ asked Dr. Monaco to define, by exertion and skill level, Plaintiff's previous work experience. (R. at 50). Dr. Monaco responded that, as the claimant was a licensed cosmetologist, her skill level was seven and her exertion level was light.[36] (R. at 50 – 51). Plaintiff's work as a deli-worker was unskilled, with a medium exertion level.[37] (*Id.*). The ALJ's first hypothetical asked Dr. Monaco to consider a person with Plaintiff's age, education, and work experience, who was unable to climb, crawl, kneel, squat, balance on heights, or regularly operate foot controls. (*Id.*). Such person would be unable to operate dangerous machinery, or bend at the waist repeatedly to ninety degrees. (*Id.*). Assuming said person was limited to light work activity, the ALJ asked Dr. Monaco if the person would be able to engage in any of Plaintiff's former work. (R. at 51).

Dr. Monaco began by stating that the hypothetical as stated would eliminate the deli worker position. (R. at 52). He went on to explain that, within the DOT, there are no light

---

[34]     Plaintiff testified her medication caused drowsiness. (R. at 46 – 47).
[35]     Dr. Monaco's qualifications include extensive experience holding director and associate director-level positions with programs involved in remedial education and career development for veterans and for youth in the Pittsburgh public schools. (R. at 99 – 103).
[36]     Normally, the exertion level would be medium. However, given the Plaintiff's description of her past work, Dr. Monaco chose to categorize it as light. The DOT categorizes cosmetology as medium-exertion employment. (R. at 50). The ALJ asked further questions of Plaintiff in order to ascertain whether her previous work as a cosmetologist was light or medium in nature. (R. at 53 – 54).
[37]     Plaintiff had testified that as a deli-worker, she had to lift five to ten pounds of deli meats and cheeses. (R. at 43).

exertion hairstylist type positions; however, he believed Plaintiff's previous work, as described, warranted a light categorization. (R. at 54 – 55). He went on to testify that there were unskilled, light exertion positions available in cosmetology such as hair washing. (R. at 55 – 56). Dr. Monaco also advised that there were a half million cosmetology jobs nationally, and one third of those could be done in a light category.[38] (R. at 56).

The second hypothetical posed by the ALJ described a person who was unable to report for work on an irregular random basis three or more times a month, for several months. (*Id.*). The ALJ inquired whether such a person would be able to conduct the cosmetology jobs discussed above. (*Id.*). Dr. Monaco replied that such a person would be unable to do so. (*Id.*).

The ALJ followed up by asking a third hypothetical. He inquired whether being off-task ten to fifteen percent of the workday, excluding regularly scheduled breaks, for an extended period of time, would preclude full-time employment. (R. at 56 – 57). Dr. Monaco replied that a person with these limitations would not be able to obtain or maintain a job. (R. at 57).

Plaintiff's attorney also made some inquiries. (R. at 57). He first asked whether a person who suffers numbness in her feet, and limitations on standing after fifteen minutes, could operate foot pedals in a hair salon. (R. at 57-58). Dr. Monaco replied that such a person would be able to operate the foot pedals for fifteen minutes, but afterwards would be unable. (R. at 58). Plaintiff's attorney then asked if numbness and tingling in a person's hands and feet, causing the person to drop things, would preclude performance of the discussed hairstylist positions.[39] (*Id.*). Dr. Monaco replied that such a person would be unable to perform such jobs. (*Id.*). Plaintiff's attorney posed a third hypothetical, asking whether a person suffering almost daily headaches, and required to nap in a dark quiet room at unpredictable times, would be able to work full-time.

---

[38] Leaving approximately 165,000 jobs available. (R. at 57).
[39] Follow-up questions were required of the Plaintiff in order to ascertain how often she dropped things. (R. at 59). She stated that she dropped things at least once a day. (*Id.*).

(R. at 59 – 60).  Dr. Monaco replied that there would not be any type of work such a person could perform.  (R. at 60).

## IV.  STANDARD OF REVIEW

To be eligible for social security benefits under the Act, a claimant must demonstrate to the Commissioner that he or she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least twelve months. 42 U.S.C. §423(d)(1)(A); *Brewster v. Heckler,* 786 F. 2d 581, 583 (3d Cir. 1986).  When reviewing a claim, the Commissioner must utilize a five-step sequential analysis to evaluate whether a claimant has met the requirements for disability.  20 C.F.R. §§ 404.1520, 416.920.

The Commissioner must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, App'x 1; (4) whether the claimant's impairments prevent him from performing his past relevant work; and (5) if the claimant is incapable of performing his past relevant work, whether he can perform any other work which exists in the national economy.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *see Barnhart v. Thomas*, 540 U.S. 20, 24 – 25 (2003).  If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy.  *Doak v. Heckler*, 790 F. 2d 26, 28 (3d Cir. 1986).

Judicial review of the Commissioner's final decisions on disability claims is provided by statute, and is plenary as to all legal issues. 42 U.S.C. §§ 405(g)[40], 1383(c)(3)[41]; *Schaudeck v. Comm'r of Soc. Sec.*, 181 F. 3d 429, 431 (3d Cir. 1999). Section 405(g) permits a district court to review the transcripts and records upon which a determination of the Commissioner is based; the court will review the record as a whole. *See* 5 U.S.C. §706. The district court must then determine whether substantial evidence existed in the record to support the Commissioner's findings of fact. *Burns v. Barnhart,* 312 F. 3d 113, 118 (3d Cir. 2002).

Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales,* 402 U.S. 389, 401 (1971)). If the Commissioner's findings of fact are supported by substantial evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson,* 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D. Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196 – 97 (1947). The

---

[40]     Section 405(g) provides in pertinent part:

> Any individual, after any final decision of the [Commissioner] made after a hearing to which he was a party, irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... brought in the district court of the United States for the judicial district in which the plaintiff resides, or has his principal place of business

42 U.S.C. § 405(g).

[41]     Section 1383(c)(3) provides in pertinent part:
> The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.

42 U.S.C. § 1383(c)(3).

court will not affirm a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196 – 97. Further, "even where this court acting *de novo* might have reached a different conclusion . . . so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F. 2d 1185, 1190 – 91 (3d. Cir. 1986).

## V.    DISCUSSION

In his decision, the ALJ concluded that Plaintiff suffered medically determinable severe impairments in the way of history of right knee surgery, back disorders, sleep apnea, seizures, headaches, hypertension, and obesity. (R. at 15). As a result of said impairments, the ALJ concluded that Plaintiff would be limited to light work not involving climbing, crawling, kneeling, squatting, or balancing as an integral component of her work, using foot controls on a regular or ongoing basis, operating dangerous machinery, or bending at the waist to ninety degrees. (R. at 16). Nonetheless, based upon the testimony of the vocational expert, the ALJ found that Plaintiff would be capable of returning to her former employment as a licensed cosmetologist. (R. at 22 – 23). Plaintiff was not, therefore, awarded benefits. (R. at 23).

Plaintiff objects to this decision by the ALJ, arguing that the ALJ erred in failing to conclude that Plaintiff's syringomyelia met the requirements for an automatic finding of disability at Step 3, in failing to adequately accommodate Plaintiff's complaints of difficulty with the use of her right hand, in failing to award at least a closed period of benefits based upon Plaintiff's headache pain, in failing to fully credit her claims of limitation in standing and

walking, and in failing to accommodate Plaintiff's claimed depression.[42]  (ECF No. 16 at 7 – 12).  Defendant counters that the ALJ's decision was properly supported by substantial evidence, and should be affirmed.  (ECF No. 18 at 9 – 15).  The Court agrees with Defendant.

A.  Syringomyelia

Plaintiff first argues that the ALJ committed reversible error when he failed to determine at Step 3 that Plaintiff met the requirements for an automatic finding of disability under 20 C.F.R., Pt. 404, Subpt. P, App'x 1, Listing 11.19 (Syringomyelia).  (ECF No. 16 at 7 – 8). Listing 11.19 allows an award of benefits when the record demonstrates that a claimant is diagnosed with syringomyelia with:

A. Significant bulbar signs; or
B. Disorganization of motor function as described in 11.04B.

Listing 11.04B requires a finding of:

B. Significant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C).

11.00C states that:

C. Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms.

It is Plaintiff's contention that her diagnosis of syringomyelia and accompanying symptomology meet the criteria under Listing 11.19, specifically, 11.19B.  The Court disagrees.

---

[42]     Plaintiff also argues error on the part of the Appeals Council as cause for reversal and/ or remand (ECF No. 16 at 13 – 15); however, the Court lacks the statutory authority to review such arguments.  *See* footnote 3, *supra*, at 3.

While the ALJ did not specifically mention or discuss Listing 11.19 at Step 3 of his analysis, he was not required to do so. As long as the ALJ's decision – when read as a whole – reveals that the ALJ considered the appropriate facts when deciding that a claimant did not meet any specific disability listings, the ALJ's determination is supported by substantial evidence. *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004). The ALJ is not required to "use particular language or adhere to a particular format in conducting his analysis." *Id.* at 505. Here, based upon the ALJ's thorough discussion of the record as a whole, as required for a proper 5-step analysis, the Court is able to reasonably conclude that Plaintiff's syringomyelia was not of listing-level severity.

Plaintiff's medical record undoubtedly included a diagnosis of syringomyelia and mention of a syrinx on the thoracic spine. (R. at 214). This diagnosis, however, is as close as Plaintiff comes to meeting Listing 11.19. As indicated by the ALJ, Plaintiff was regularly noted by doctors to have no gait abnormalities. (R. at 18 – 20). Plaintiff had full strength in her upper and lower extremities, an active range of motion in her joints, intact sensation, negative straight leg raising, relatively normal EMG results, generally mild MRI findings with respect to her spondylosis and disc degeneration, and repeated findings that her syrinx was stable, without cord enhancement, and without other notable side effects. (R. at 18 – 20). Plaintiff's doctors prescribed only conservative treatment. (R. at 18 – 20).

It is clear, based upon this treatment history, that Plaintiff's subjective complaints were not corroborated by objective medical findings. Plaintiff would have this Court find that physician notes recording Plaintiff's subjective complaints sufficed to constitute objective confirmation; however, this is not the case. The objective examinations and tests conducted by Plaintiff's physicians certainly did not indicate that Plaintiff's syringomyelia contributed in any

significant way to her functional limitation, and Plaintiff provides the Court with no such evidence from the record, certainly not evidence of disorganized motor function of the severity envisaged under 11.19B. "For a claimant to show his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Jones v. Barnhart*, 364 F. 3d 501, 504 (3d Cir. 2004) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). Plaintiff was diagnosed with syringomyelia, but the objective medical record did not demonstrate that this impairment met the requirements under Listing 11.19B. The ALJ's Step 3 determination was, therefore, amply supported by substantial evidence.

B.  Use of Right Hand

Plaintiff next claims that because she testified regarding numbness in her right hand which caused her to drop items at least once per day, the ALJ was required to accommodate this as a limitation in his RFC assessment and hypothetical. (ECF No. 16 at 9). The Court disagrees. An ALJ is required to include limitations in his or her RFC assessment and hypothetical question which are supported by the record. *Ramirez v. Barnhart*, 372 F. 3d 546, 552 (3d Cir. 2004). However, an ALJ is not compelled to include limitations which are not credibly established or which are in conflict with the medical record. *Rutherford v. Barnhart*, 399 F. 3d 546, 554 (3d Cir. 2005).

As noted by the ALJ, Plaintiff was regularly found to have full strength in her extremities. (R. at 18 – 20). Plaintiff was also generally noted to have intact sensation. (R. at 18 – 20). There were no objective findings by any physicians that Plaintiff experienced difficulty grasping objects on a regular basis. EMG testing ordered as a result of complaints of numbness and tingling revealed normal nerve conduction with no evidence of radiculopathy, plexopathy,

entrapment neuropathy, or peripheral neuropathy. (R. at 20). Objective examination and test results did not reflect the degree of abnormality alleged by Plaintiff. The ALJ's omission of Plaintiff's subjective complaints regarding her right hand from his RFC and hypothetical was supported by substantial evidence.

C. Migraine Headaches

Plaintiff also argues that the ALJ erred when he failed to find that Plaintiff's migraine headaches were so severe that it was necessary for her to lie down for a least one hour, several times per week. (ECF No. 16 at 9 – 10). Based upon the testimony of the vocational expert, Plaintiff would not be able to engage in full-time work in such a case. Plaintiff argues for at least a closed period of disability, as a result. As discussed by the ALJ, the medical record does not support such a finding.

Plaintiff's treatment for headaches was minimal, and she obtained relief from prescription medication, with occasional fluctuations. (R. at 17 – 18). Abuse of medication and medication adjustments were often cited as the reason for these fluctuations, and Plaintiff was noted in the medical record to have denied experiencing headaches on several occasions. In its statement regarding Plaintiff's alleged disability, even New Wilmington Family Medicine Associates made no mention of headaches. (R. at 21). Simply, there was no evidence in the record to support the contention that Plaintiff's headaches were totally debilitating, and Plaintiff's treatment history for headaches was minimal despite her complaints. The Court will not remand or reverse the ALJ's decision to omit a need to lie down several times per week from his RFC and hypothetical, in light of this total lack of objective support.

D.  Standing and Walking

Plaintiff goes on to argue that because the ALJ did not accommodate her subjective claim that she could walk only thirty to fifty feet and could stand only ten to fifteen minutes at a time, he thereby committed error.  (ECF No. 16 at 11).  The ALJ's provision of a need to avoid use of foot controls and pedals was allegedly insufficient.  The Court must disagree.  Without rehashing all of the above discussed evidence, the Court takes note that the ALJ discussed objective medical findings from Plaintiff's own physicians stating that her gait was normal and that she had full strength in her lower extremities.  (R. at 18 – 20).  There was no indication of weakness of the nature alleged by Plaintiff during her administrative hearing.  Additionally, the ALJ relied in part upon the findings of Dr. Kar, who – based upon his review of the medical record – found that the evidence supported an ability to stand and walk approximately six hours or an eight hour work day.  (R. at 22).  The ALJ provided substantial evidence to support his findings with respect to Plaintiff's ability to stand and walk.

E.  Depression

Lastly, Plaintiff asserts that the ALJ should have provided some accommodation in his RFC assessment and hypothetical for her depression.  (ECF No. 16 at 12).  Depression was not found by the ALJ to be a severe impairment at Step 2.  (R. at 15).  Plaintiff argues that the ALJ confused her negligible mental health treatment history with a lack of mental health problems.  However, Plaintiff openly admits that she had not seen a mental health specialist and had not sought treatment for approximately two years prior to her hearing.  (ECF No. 16 at 12).  Plaintiff seems to forget that it is her burden to prove that she is entitled to disability benefits.  *Early v. Heckler*, 743 F. 2d 1002, 1007 (3d Cir. 1984) ("Under the Act, the burden of proof as to the medical basis of a finding of disability remains on the claimant at all times").  While there are

some indications within the record that Plaintiff had some issues with depression, none of her physicians appeared to provide any treatment or to recommend seeking treatment. Further, there is no record that Plaintiff took any medications for depression. Plaintiff also frequently denied experiencing depression, and her mood and affect were frequently observed to be normal and appropriate. Finally, there was no mention made of depression when New Wilmington Medicine Associates opined that Plaintiff was disabled.

An ALJ has a "duty to develop a full and fair record," and "must secure relevant information regarding a claimant's entitlement to social security benefits." *Ventura v. Shalala*, 55 F. 3d 900, 902 (3d Cir. 1995). Due regard must be given to the "beneficent purposes" of the Social Security Act. *Id.* Yet, a claimant still bears the ultimate burden of producing sufficient evidence to demonstrate disability. *Schwartz v. Halter*, 134 F. Supp. 2d 640, 656 (E.D. Pa. 2001). Although the Act "provides an applicant with assistance to prove his claim, the ALJ does not have a duty to search for all of the relevant evidence available, because such a requirement would shift the burden of proof." *Id.* (citing *Hess v. Sec'y of Health, Educ., and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974)). Here, Plaintiff had the opportunity to seek and provide evidence of mental impairment. The ALJ held the record open for an additional thirty days in order for Plaintiff to provide additional medical evidence. (R. at 60 – 61). She did not do so[43]. Based upon this history, the Court would be hard pressed to find that the ALJ was required to do more in light of a near complete absence of significant mental health notations in Plaintiff's treatment record.

---

[43]     Plaintiff did not submit additional evidence for consideration until after the ALJ had issued his opinion on June 14, 2010 (R. at 12 – 23). The majority of said evidence post-dated the ALJ's decision and made no mention of depression or limitations stemming therefrom. (ECF No. 15-1 – 15-5).

## VI. CONCLUSION

Based upon the foregoing, the ultimate decision by the ALJ to deny benefits to Plaintiff was adequately supported by substantial evidence from Plaintiff's record. Reversal or remand of the ALJ's decision is not appropriate. Accordingly, Plaintiff's Motion for Summary Judgment is denied, Defendant's Motion for Summary Judgment is granted, and the decision of the ALJ is affirmed. Appropriate Orders follow.

_s/ Nora Barry Fischer_
Nora Barry Fischer
United States District Judge

Dated: July 24, 2013
cc/ecf: All counsel of record.